UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ALBERT WILLIAMS,

              Plaintiff,

      v.                                                                21-CV-1180-LJV
                                                                                ORDER
ANDREW M. CUOMO, *et al.*,

              Defendants.

_____

       On November 1, 2021, the *pro se* plaintiff, Albert Williams, commenced this

action under 42 U.S.C. § 1983, asserting claims arising from his incarceration at the

Attica Correctional Facility.  Docket Item 1.  This Court screened Williams's claims

under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, *see* Docket Item 7, and after Williams

amended his complaint, Docket Item 12, this Court screened his amended claims, *see*

Docket Item 15.  Three sets of claims then proceeded to service: (1) the retaliation and

due process claims against Lieutenant Kirk Koenig; (2) the inadequate medical care

claims against Physician Assistant ("PA") Alicia Schunk and Dr. Paula Bozer; and (3)

the mail interference claims against Correction Officer Andrew Morris.  *Id.*; *see* Docket

Items 23 and 28 (*Valentin* orders).

       On September 19, 2023, the defendants moved to dismiss the amended

complaint, Docket Item 32; on March 11, 2024, Williams responded,[1] Docket Item 42;

and on March 29, 2024, the defendants replied, Docket Item 46.

_____

      [1] In his response, Williams suggests that it is improper for one attorney to
represent all the defendants.  Docket Item 42 at 1.  But he cites only criminal cases in
which joint representation risked a defendant's right to counsel.  *Id.* (citing *People v.
Gomberg*, 38 N.Y.2d 307, 342 N.E.2d 550 (1975); *United States v. White*, 692 F.3d 235

For the reasons that follow, the defendants' motion to dismiss is granted with respect to the due process claims against Koenig but otherwise denied.

## BACKGROUND[2]

### I.     FALSE MISBEHAVIOR TICKET

Williams has been imprisoned for more than 31 years.  Docket Item 12 at 20. During that time, he has written many complaints "both within[] and outside [] the [New York State] Department of Corrections and Community Supervision" ("DOCCS").  *Id.* at 8.  Due to his reputation for writing effective complaints, Williams is "hated" by prison officials and continuously subjected to "vindictive[,] retaliatory behavior."  *Id.* at 8-9 (some capitalization omitted).

On September 12, 2020, prison officials "Keep-Locked [sic]"[3] Williams "for allegedly attempting to give his [c]ell [p]hone number" to a civilian library clerk, "Ms. V. Basher."  *Id.* at 12.  Two days later, Sergeant Olszewski—who was not present when

---

(2d Cir. 2012); *People v. Rouse*, 34 N.Y.3d 269, 140 N.E.3d 957 (2019)).  Therefore, to the extent Williams's response can be construed as a motion to disqualify defense counsel, that motion is denied.

[2] In deciding a motion to dismiss, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  The following facts are taken from the amended complaint, Docket Item 12, and the documents attached to it, *see Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.").

[3] Generally, "[k]eeplock is a form of administrative segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates."  *Holland v. Goord*, 758 F.3d 215, 218 n.2 (2d Cir. 2014) (citation omitted).

the interaction with Basher occurred—served Williams with a Tier 2 misbehavior report for "[s]oliciting, [h]arassment, and [i]nter[fer]ence w[ith] an [e]mployee." *Id.* Williams pleaded not guilty to the report, and Lieutenant Diehl convened three hearings to address the matter. *Id.*

At the first hearing, Williams explained that the report was the result of a "misunderstanding": He and several other inmates in the library were "joking about calling each other on [their] cell phone[s]," and he directed one joke toward Basher. *Id.* During that hearing, Williams also asked that Basher appear as a witness. *Id.*

At the second hearing, after Diehl played several audio recordings related to the incident, Basher appeared by telephone. *Id.* at 13. To the surprise of Williams and Diehl, she said that she had written a misbehavior report herself. *Id.* Neither Williams nor Diehl had seen a copy of Basher's report, however, and "there [was] no record of it anywhere." *Id.* at 14. When Williams asked Basher whether she agreed with the version of events in Olszewski's misbehavior report, she replied that she "did not know that [Olszewski] wrote [a report]." *Id.* Diehl then adjourned the hearing so that he could meet with Olszewski to "find out why he rewrote the misbehavior report" without Basher's "knowledge or[] endorsement." *Id.*

During the third hearing, Olszewski and Lieutenant Koenig—the "reviewing [lieutenant]" with respect to the misbehavior report—joined Williams and Diehl. *Id.* Koenig testified that he had asked Olszewski to rewrite the misbehavior report because "there was something wrong" with Basher's charges and Basher was "unavailable" to rewrite the report herself. *Id.* at 15. Koenig did not remember what was wrong with the original charges, however. *Id.* When Williams asked why Koenig did not wait until

3

Basher was available to rewrite the report, Koenig responded that he had to produce the report within the "allotted time." *Id.*

At the conclusion of the three-day hearing, Diehl found Williams guilty of all charges and imposed a 30-day loss of privileges. *Id.* He also told Williams that Basher's original misbehavior report had been destroyed. *Id.* Because Williams was found guilty, he was denied a transfer to a facility closer to his family. *Id.* at 16. But after Williams filed an Article 78 proceeding challenging Diehl's decision, *id.* at 15, the New York State Attorney General expunged the ticket, *id.* at 15, 31.

Several officials were responsible for the proceedings related to the false misbehavior ticket. As relevant here, Koenig wanted to punish Williams because Williams had written a complaint that resulted in Koenig's demotion. *Id.* at 16.

## II.    DENIAL OF MEDICAL CARE

Williams has Peyronie's disease, *id.* at 17, "a noncancerous condition resulting from fibrous scar tissue that develops on the penis and causes curved, painful erections" that can interfere with sexual activity, *see* Docket Item 15 at 7. Williams has received intermittent treatment for this condition since 2011. *See* Docket Item 12 at 34-39.

In January 2019, Williams consulted his then-medical provider, PA Schunk, about continuing to see a urologist to treat his Peyronie's disease. *Id.* at 17. But Schunk denied his request because of her "mistaken belief that [Williams] continue[d] to refuse medical appointments," costing New York State "lots of money" due to missed appointments. *Id.* Williams tried to explain that his missed appointments were not his fault because prison officials did not tell him when his appointments were scheduled.

*Id.*  But Schunk "refused to hear" Williams's explanation and "denied any further medical referral[]s."  *Id.*

In April 2019, Williams "finally" was able to change medical providers and was referred to a urologist, Dr. Gerald Suffrin, at the Wende Correctional Facility.  *Id.* at 18. Suffrin recommended that Williams receive an injection to treat his condition.  *Id.*  But a few weeks later, the DOCCS Regional Medical Director, Dr. Bozer, denied Suffrin's recommendation after reviewing an ultrasound of Williams that had been performed two years earlier.  *Id.*

### III.    MAIL INTERFERENCE

Finally, prison officials read all of Williams's legal mail, "report anything of interest" to their supervisors, and fail to deliver Williams his mail "concerning [his] prior written complaints."  *Id.* at 23.  Williams has overheard Officer Morris screaming, "I don't care if [Williams] signed for it or not, if [the mail] is about us that f[***]er doesn't get it." *Id.*

### **LEGAL PRINCIPLES**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

### I.   RETALIATION

Williams asserts a retaliation claim against Koenig based on Koenig's alleged instruction to Olszewski to write a false misbehavior report against Williams.  The defendants argue that Williams's retaliation claim fails on its face because the amended complaint "do[es] not plausibly suggest a retaliatory motive by Koenig."  Docket Item 32-1 at 17-20.  This Court disagrees.

To establish a claim for retaliation under section 1983, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).  "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."  *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001).

"Ordinarily, a plaintiff can survive a motion to dismiss based on the pleadings so long as he has alleged facts[] that[,] if proven, would support a cause of action."  *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001) (summary order).  "However, because of the 'ease with which claims of retaliation may be fabricated, [courts] examine prisoners' claims of retaliation with skepticism and particular care.'"  *Id.* (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).  "Because of the potential

for abuse, '[courts] insist[] on a higher level of detail in [the] pleading[s].'" *Id.* (quoting *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987)).

The defendants argue that Williams has failed to establish a causal connection between the grievance that resulted in Koenig's demotion and Koenig's alleged retaliation for three reasons. Each argument fails for a different reason.

First, the defendants point to Koenig's statement that he instructed Olszewski to rewrite the misbehavior report "because it was defective in some way and Basher was 'unavailable' to fix it." Docket Item 32-1 at 18. But that argument does little more than raise an issue of fact about why Koenig did what he did, and Koenig proffered that non-retaliatory explanation during a hearing when he was unlikely to admit any retaliatory motive. Moreover, Koenig's vague statement that "there was something wrong" with Basher's original report does not identify any actual issue requiring a rewritten report, suggesting his explanation may well have been pretextual. *See* Docket Item 12 at 15. And as Williams asserts in his response, Koenig could have requested an extension of time to serve a corrected misbehavior report written by Basher rather than having Olszewski rewrite the report.[4] Docket Item 42 at 10.

Second, the defendants note that Williams has alleged that the misbehavior report "was really orchestrated by" another officer for the purpose of "hav[ing] [Williams] removed from the Honor Block." Docket Item 32-1 at 18 (citing Docket Item 12 at 15).

---

[4] "Given [Williams's] *pro se* status, factual allegations raised for the first time in response to [the] motion to dismiss may be considered when ruling on said motion." *See Gress v. DeJoy*, 2024 WL 1072730, at *7 n.4 (D. Conn. Mar. 12, 2024) (citing *Sealy v. State Univ. of N.Y. at Stony Brook*, 834 F. App'x 611, 615-16 (2d Cir. 2020) (summary order); *Canady v. U of R/Strong Mem'l Med. Ctr.*, 2022 WL 17825332, at *3 (2d Cir. Dec. 21, 2022) (summary order)).

But that would not exonerate Koenig:  It is possible that both Koenig and that officer were motivated to retaliate against Williams, who has filed many complaints against prison officials.  *See* Docket Item 12 at 8-9.

Third, the defendants contend that Williams's explanation for Koenig's retaliation does not provide sufficient detail to sustain an inference of a causal connection.  Docket Item 32-1 at 18-19.  They note that Williams does not say when he filed the grievance that resulted in Koenig's demotion, they estimate that about two years passed between those events, and they argue that this is a case where "there was not a close temporal proximity between the protected activity and the alleged retaliatory act."  *Id.* (citation omitted).  And the defendants are correct that a period of multiple years ordinarily is too long to sustain a retaliation claim without some other evidence of retaliatory motive. *See, e.g.*, *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (no causal connection based on proximity where three years elapsed between protected activity and adverse action).

But evaluating causal connection in the context of a retaliation claim is a fact-specific inquiry.  *See Espinal*, 558 F.3d at 129 (noting that a court can "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases").  And Williams not only pleads a plausible reason why Koenig might want to retaliate—Williams's grievance that resulted in Koenig's lost promotion—he also provides good reason why Koenig might have waited for an "opportune time" to retaliate:  When Koenig eventually became "the reviewing [lieutenant]" for misbehavior reports, he was in an ideal position "the exact his revenge." Docket Item 42 at 10.  Given the valuable benefits that Williams's grievance cost

Koenig, *see id.* (explaining that the position Koenig lost had "[o]ne of the highest pay grades in the facility" in "a nice [and] easy, relaxed shift"), it is plausible that Koenig would harbor a grudge against Williams for months or years.

In sum, at this early stage of the litigation, Williams's allegations create a plausible inference that Koenig retaliated against him for filing the grievance that resulted in Koenig's demotion.  The defendants' motion to dismiss the retaliation claim against Koenig therefore is denied, as is their request that Williams provide a more definite statement of that claim, *see* Docket Item 32-1 at 19-20.

## II.    DUE PROCESS

Williams asserts a due process claim against Koenig based on the same facts that give rise to his retaliation claim.  The defendants argue that claim should be dismissed because it is duplicative of the retaliation claim.  Docket Item 32-1 at 16-17. This Court agrees.

"[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).  "Accordingly, to the extent that [Williams] is alleging that [Koenig] retaliated against him because he filed grievances, his claim is more properly characterized as being a First Amendment [r]etaliation [c]laim."  *See Barnes v. County of Monroe*, 2012 WL 92553, at *8 n.11 (W.D.N.Y. Jan. 11, 2012).  Williams's due process claim against Koenig therefore is dismissed without leave to amend.

III.   **INADEQUATE MEDICAL CARE**

Williams asserts inadequate medical care claims against Schunk and Bozer. The defendants argue that those claims fail because (1) they are untimely, Docket Item 32-1 at 10-12, and (2) the second amended complaint fails to state a claim for inadequate medical care, *id.* at 12-16.

A.   **Timeliness**

Williams's inadequate medical care claims arise from Schunk's actions in January 2019 and Bozer's actions in May 2019.  Docket Item 12 at 17-18.  The statute of limitations for those claims therefore expired in January 2022 and May 2022, respectively.  *See Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (explaining that in New York State, section 1983 claims are "subject to a three-year statute of limitations" (citation omitted)).

Williams filed his original complaint on November 1, 2021.  Docket Item 1. Neither Schunk nor Bozer were listed as defendants in the caption of the original complaint.  *See id.* at 2-4.  So, the defendants say, the statute of limitations for the claims against Schunk and Bozer expired before Williams filed the amended complaint listing Schunk and Bozer as defendants on September 16, 2022.  Docket Item 32-1 at 10-11; *see* Docket Item 12.

"[C]ourts in this Circuit have found *pro se* complaints to sufficiently plead claims against defendants who are not even named in the caption or the list of defendants when there are adequate factual allegations in the body of the complaints to establish that the plaintiff intended them as defendants."  *Burris v. Nassau Cnty. Dist. Att'y*, 2023 WL 6450398, at *9 (E.D.N.Y. Sept. 30, 2023) (collecting cases construing *pro se*

complaints as asserting claims against parties not named in captions).  Williams's

original complaint did not list Schunk or Bozer as defendants in the caption, but as the

defendants concede, "certain acts by [Schunk and Bozer] . . . were discussed in the

original complaint."  Docket Item 32-1 at 11; *see* Docket Item 1 at 12-13.  In fact, this

Court understood the original complaint to assert inadequate medical care claims

against the "regional medical director"—Bozer—and other prison officials, including

Schunk.  *See* Docket Item 7 at 5, 18-19.

Bearing in mind the Second Circuit's warning "never to exalt form over

substance" especially with respect to *pro se* pleadings, *see Shariff v. United States*, 689

F. App'x 18, 19 (2d Cir. 2017) (summary order) (quoting *Phillips v. Girdich*, 408 F.3d

124, 128 (2d Cir. 2005)), the Court concludes that the inadequate medical care claims

against Schunk and Bozer were first asserted in the original complaint filed on

November 1, 2021.  Those claims therefore are not time barred.

## B.    Failure to State a Claim

A claim of inadequate medical care rises to the level of an Eighth Amendment

violation only when a defendant, operating under color of law, was "deliberate[ly]

indifferen[t]" to the plaintiff's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97,

104-05 (1976).  A serious medical need exists when "the failure to treat a prisoner's

condition could result in further significant injury or the unnecessary and wanton

infliction of pain."  *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting

*Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

"[N]ot every lapse in prison medical care will rise to the level of a constitutional

violation."  *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).  For example, "a

complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. In other words, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* Rather, "to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.*

As the Court concluded previously, Williams "has alleged that he suffers from a serious medical condition." Docket Item 12 at 17-18. But the defendants argue that Williams "has failed to allege that [Schunk and Bozer] acted with deliberate indifference to" that condition. Docket Item 32-1 at 13. The Court addresses the claims against each defendant in turn.

### 1.     Schunk

The defendants argue that Schunk's refusal to allow Williams to see a urologist does not constitute deliberate indifference "because she was under the 'mistaken' impression he was refusing to attend his medical appointments." *Id.* But Williams alleges that when he tried to explain that his missed appointments were not his fault, Schunk "refused to hear" his explanation. Docket Item 12 at 17. What is more, when Williams told Schunk "that he was experiencing pain," she responded, "I don't care, go back [to the housing unit]." Docket Item 42 at 5.

Accepting Williams's allegations as true—as it must on a motion to dismiss—the Court finds that Williams has plausibly alleged that Schunk was deliberately indifferent to his serious medical needs. The motion to dismiss the inadequate medical care claim against Schunk therefore is denied.

###### 2. Bozer

The defendants note that a "prison doctor who relies on [her] medical judgment to modify or disagree with an outside specialist's recommendation . . . is not said to act with deliberate indifference." Docket Item 32-1 at 14-16 (quoting *Santiago v. Coniglio*, 2009 WL 3672062, at *4 (W.D.N.Y. Oct. 29, 2009)). Therefore, they argue, Williams has not stated a claim for inadequate medical care against Bozer based on his allegation "that on one occasion she declined to follow the recommendations of an outside urology consultant." *Id.* But the documents Williams attached to his amended complaint, Docket Item 12 at 33-36, tell a different story.

Williams's medical records show that in April 2019, he saw Dr. Suffrin, a urologist, for pain related to Williams's "erectile curvature." *Id.* at 34 (capitalization omitted). Suffrin recommended an injection of Verapamil, *id.*, which can treat Peyronie's disease.[5] He also noted that an April 2017 ultrasound of Williams's penis showed "no plaque"—the cause of Peyronie's disease[6]—and he suggested that Williams's treating physicians "may wish to consider [a] repeat [ultrasound]." *Id.* But Bozer ordered neither the Verapamil injection nor a repeat ultrasound to determine whether an injection was necessary; instead she simply denied Williams's request for treatment based on her review of the two-year-old ultrasound, concluding Williams "lack[ed] [a] clear need" for a current ultrasound. *Id.* at 36 (capitalization omitted).

---

[5] *See* Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/patient-education/about-penile-injections-verapamil (last accessed May 24, 2024).

[6] *See* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/peyronies-disease/symptoms-causes/syc-20353468 (last accessed May 24, 2024).

Those facts, accepted as true, raise a plausible inference that Bozer "base[d] her refusal of treatment on [an] outdated medical diagnosis [and] left [Williams] w[ith] a painful . . . and degenerative medical condition." *See* Docket Item 42 at 8.  What is more, if Bozer did that, she must have ignored the specialist's suggestion of either an injection or updated testing.  Williams's allegations therefore plead deliberate indifference by Bozer and state an inadequate medical care claim against her, and the defendants' motion to dismiss that claim is denied.

## IV.   MAIL INTERFERENCE

"Under the First Amendment, prisoners have a right to the free flow of incoming and outgoing mail." *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (citation and internal quotation marks omitted).  "A prisoner's right to receive and send mail, however, may be regulated" if the regulations are reasonably related to legitimate penological interests.  *Id.*  "In balancing the competing interest implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citation omitted).

"While a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Id.* (internal citations omitted).  "Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Id.* (citation and internal quotation marks omitted).  "[A]s few as two incidents of mail tampering c[an] constitute an actionable violation" if (1) "the incidents suggest[] an ongoing practice of censorship unjustified by a substantial government interest," or (2) "the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the

legal representation received." *Id.* (citation omitted). "[D]istrict courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few." *Id.* at 351-52 (collecting cases).

The defendants argue that the amended complaint fails to state a mail interference claim against Morris because it "is largely devoid of details concerning Morris'[s] allegedly wrongful acts." Docket Item 32-1 at 8-10. Rather, they say, it makes a single allegation about Morris's "one-time instruction to an unspecified officer, at an unknown date and time, to not give [Williams] his legal mail." *Id.* at 9. And they say that "this single incident is not enough, on its own, to support a First Amendment legal mail tampering claim." *Id.* at 9-10 (collecting cases).

Williams's response to the motion to dismiss says that interference with his legal mail "has been a continuous behavior pattern" throughout his incarceration and that his legal mail is "always read [and] reported to the block officer . . . before he even receive[s] it." Docket Item 42 at 1-2. And he adds that Morris once said to him, with respect to interference with Williams's legal mail, "I don't like you[,]  who do you think you are writing up officers, [and] do you know where you['re] at, what can happen to you[?]" *Id.* at 2.

The question of whether Williams has stated a mail interference claim against Morris is a close one. Although Williams describes only one specific instance of mail interference—which ordinarily cannot sustain a claim—Morris's specific alleged instruction to withhold Williams's legal mail evinces "invidious intent" and gives rise to a plausible inference of "an ongoing practice of censorship unjustified by a substantial government interest." *See Davis*, 320 F.3d at 351-52. This Court therefore would not

15

dismiss Williams's mail tampering claim without giving him an opportunity to allege another specific instance.  But in light of Williams's response to the motion to dismiss, it appears likely that he could allege such facts.  Therefore, in the interest of judicial economy and moving this nearly three-year-old case to the next stage, the Court finds that Williams's allegations of interference with his mail are sufficient to survive the defendants' motion to dismiss, and the mail interference claim against Morris therefore may proceed.

## **CONCLUSION**

For the reasons stated above, the defendants' motion to dismiss the amended complaint, Docket Item 32, is GRANTED in part and DENIED in part.  Williams's due process claim against Koenig is dismissed, but his other claims survive.  The defendants shall answer the amended complaint within 30 days of the date of this order.


SO ORDERED.

Dated:   May 24, 2024
Buffalo, New York


  */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE